1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NANCY LENDALL,

        Plaintiff,

   v.

CHASE MANHATTAN MORTGAGE
CORPORATION,

        Defendant.

_____/

No. C 05-03295 WHA

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT
AND DENYING MOTION
FOR LEAVE TO AMEND
AND RESCHEDULING
DISCOVERY HEARING**

**INTRODUCTION**

     In this diversity action for breach of contract and fraud, the basic question is whether

plaintiff can recover roughly $350,000 she previously reimbursed to her employer, Chase

Manhattan Mortgage Corporation. The latter has moved for summary judgment pursuant to

Federal Rule of Civil Procedure 56. As part of her opposition, plaintiff Nancy Lendall has

moved for leave to amend her complaint so as to add a new claim under California Labor

Code § 221. Plaintiff's request to amend, at the end of the discovery period and so close to

trial, is far too late and unjustified. Plaintiff, however, has established triable issues of fact as to

the two claims in her operative complaint. Accordingly, plaintiff's motion for leave to amend is

**DENIED** and defendant's motion for summary judgment is also **DENIED**.

**United States District Court**
For the Northern District of California

**STATEMENT**

Defendant Chase Manhattan Mortgage Corporation provides home-finance products such as home loans.  Chase funds its home loans through money it draws from elsewhere.  Chase's home loans are brokered by loan officers, who are employees of Chase.  In February 1997, Chase hired Nancy Lendall to be such a loan officer.

At the time in question, the price of home loans at Chase consisted of two components, the interest rate and the points (Schilling Decl. ¶ 7).  A "point" was equal to one percent of the loan amount (*ibid.*).  A borrower would usually pay more points in order to secure a lower interest rate (*ibid.*).  If a borrower chose to enter into a loan with Chase, the borrower either elected to "float" or to "lock in" the loan rate (*id.* at ¶ 6).  If the borrower chose the float option, the borrower took the risk that the market rate (*i.e.*, the rate at which Chase itself would acquire the money) for the loan would go up prior to closing.  If the borrower chose to lock in the loan rate, the borrower paid the locked in rate regardless of fluctuations in the market rate.

The borrower would make his or her initial agreement to a loan over the phone with a Chase loan officer.  The loan officer offered a certain rate depending on the credit history and circumstances of the particular borrower.  If the borrower chose to take out a loan with Chase, the borrower indicated his or her desire to "lock in" or "float" over the phone.  The borrower then confirmed his or her preference to lock in or to float the loan rate on a form provided by Chase to the borrower within several days.  Within roughly two weeks, the borrower was to complete further paperwork in order to finalize the loan.  The borrower could back out at any time prior to accepting the loan proceeds, subject to the loss of certain fees if he or she backed out after processing the loan application.  Critically, if the customer wanted to lock in the rate, the loan officer was required to specify this fact in the firm's computer system so that it could reserve the funds at the designated rate and thereby avoid being burned by a rise in interest rates.

Chase's loan officers negotiated loans directly with the potential borrowers.  These loan officers were paid through commissions on the loans they generated (*id.* at ¶ 8; Compl. Exh. A).  If a loan officer closed a loan for more than the market rate, an "overage" or premium was

United States District Court

For the Northern District of California

created (Schilling Decl. ¶ 8).  An overage was created, for example, if Chase made a loan at seven percent even though the market rate that day was five percent.  In contrast, if the officer closed a loan for less than the price of the product, an "underage" or loss on the loan was created (*ibid*).

There were two distinct scenarios where an underage resulted (*id*. at ¶ 9).  *First*, an underage occurred where the loan officer and the borrower agreed to a price below the market price for the loan.  Chase apparently sometimes encouraged its loan officers to create underages in this first manner in order to keep a valuable client with the company or to assure that certain referral services continued to promote Chase's products.  *Second,* an underage could occur if the loan officer neglected to reserve or lock in the funds and the interest rate increased by the time of closing.  In this scenario, the customer got the rate promised and Chase absorbed the underage.  This scenario was not supposed to happen.

In this particular case, plaintiff Lendall's employment as a loan officer with Chase was governed by two agreements.  *First*, there was an employment agreement specific to Lendall entitled "Terms of Agreement — Retail Loan Officer" (Compl. Exh. A).  The agreement, signed by Lendall, provided the following provision regarding overages and underages (*ibid*.)

> Overages and Underages will be calculated as follows:
>
> Overages —   Based on tier
>              Maximum of 2 pts.
>
> Underages — Based on tier
>             Split up to a maximum of 1 pt.; any losses
>             exceeding 1 pt. will be the responsibility of
>             the participant.
>
> Payment shall be made based on the net results of all Overages
> and Underages after each one has been separately calculated in
> the above rates.

In other words, Lendall was to receive a commission equal to the total of her overages minus any underages as calculated above.

*Second*, Lendall's employment was also governed by the "CMMC Retail Channel Loan Officer — Compensation Plan and Policy Statement California Division" (Compl. Exh. B).  The compensation plan stated that it "is to be read along with any applicable Terms of Agreement

("Terms") and both are subject to change, only in writing, at anytime and for any reason, at the discretion of the Channel Executive" (*ibid*.).  The compensation plan provided for no base salary (*ibid*.).  The plan also contained a provision regarding overages and underages (*ibid*.) (emphasis in original):

> **Overage/Underage**:  As set forth in Terms of Agreement, will be paid on a monthly basis on the last payroll of the following month.  Difference between actual revenues collected and revenue requirements will be treated as follows:
>
> > Overage amounts will be split with loan officers as per the divisional overage policy, up to maximum allowable overage limits.
> >
> > Underage amounts will be split with loan officers as per the divisional underage policy, up to normal divisional underage rules.

The compensation plan required officers to "[b]e certain that in all cases, when loans are rate locked, the lock expiration date is the sales date or exceeds the closing date specified in the sales contract.  Any exceptions must be authorized in writing by the next level manager" (*ibid*.).  Similarly, the plan provided that loan officers "cannot originate an underage in excess of divisional policy without approval from the next level manager" (*ibid*.).

*          *          *

From January 2002 to June 2003, mortgage rates were generally declining (Lendall Dep. 89; Schilling Decl. ¶ 10), a circumstance that might induce a loan officer to "play the market," as we shall see below.  In July 2003, however, there was a sharp increase in the interest rates (*ibid*.).  In a market of increasing rates, Chase was forced to fight harder to get loans because the high rates reduced the number of consumers able to afford the loans.  At around this time, therefore  the competition for home loans became very competitive due to rising rates.  In her complaint, plaintiff alleged that her division manager, Rick Cossano, "*acting on behalf of CMMC, made an oral offer to permit Ms. Lendall to negotiate rates with underages without being charged for those underages in order to secure or maintain CMMC's market share*" (Compl. ¶ 16) (emphasis added).  During oral argument, plaintiff's counsel clarified that this promise was apparently made to plaintiff several times in mid-2003.

4

United States District Court

For the Northern District of California

1   Plaintiff's manager, Cossano, learned in late 2003 that Lendall had accrued significant

2   underages. At that time, Cossano discovered that plaintiff had over thirty loans in the system

3   from July 2003 alone where the borrower's desired rate, contrary to the ground rules, had not

4   been locked in (Cossano Dep. 35). Cossano was alerted to this situation on a tip from Lendall's

5   assistant, Christina Fang (*ibid*.; Lendall Dep. 90). By late 2003, Lendall's loans had over fifty

6   loans with underages amounting to more than $350,000 (Schilling Decl. Exh. D). Cossano thus

7   became concerned that Lendall was "playing the market" (Cossano Dep. 37).

8   Playing the market involved loan officers accruing the second type of underages, *i.e.*,

9   underages in which the officer delayed in locking in a lock-in loan at the borrower's requested

10  rate. Loan officers might have done so, contrary to the ground rules, with the expectation that

11  the market rate would drop prior to closing. If the market rate dropped, the loan officer would

12  close the loan with an overage, thereby boosting the loan officer's commission. Of course, a

13  significant risk was involved with this gaming of the market. If the market rate turned upward

14  after the borrower had asked for a locked rate, Chase had to make up the difference; in turn, the

15  agreements in place shifted part of the burden of this shortfall (*i.e.*, underage) to the loan

16  officer. As stated, underages were not supposed to be created in this manner. The only

17  acceptable way to create an underage was to do so knowingly up front, as in quoting a discount

18  up front for business development reasons.

19  At Cossano's request, Lendall's branch and regional managers, Todd Brebner and Ed

20  Vaccaro, investigated the loans brokered by plaintiff during the second half of 2003. Based on

21  the investigation, Lendall's managers confirmed Cossano's suspicions that Lendall was playing

22  the market (Cossano Dep. 37). According to Vaccaro, at a meeting with him, Brebner and

23  Cossano, "Ms. Lendall admitted that 'she had made a mistake' in failing to lock the loans at the

24  rates that borrowers expected" (Vaccaro Decl. ¶ 4).

25  During oral argument, Lendall's counsel proffered the theory that Lendall's assistants,

26  including Christina Fang, were to blame for the delay in locking in the loans in a timely fashion,

27  or at least for failing to secure extensions of time in which to lock in the loans. This argument,

28  however, was contradicted, at least in part, by the loan-inventory cards submitted by Chase

1   (Schilling Decl. Exh. E).  The loan-inventory cards tracked the loans on which Lendall accrued

2   her underages during the contested time period.  According to these inventory cards, *Lendall*

3   *herself* failed to lock in the loans in a timely fashion in 42 out of the 50 loans on which

4   underages were accrued.  On the other hand, that leaves eight candidates to possibly support

5   Lendall's theory.

6       Furthermore, plaintiff's counsel argued during the hearing that the policy expressed in

7   her written employment agreements that required deduction of underages out of her commission

8   was not followed by Chase with respect to other loan officers.  The only other officer, however,

9   that Lendall pointed to as receiving different treatment than Lendall was Jason Aiello.  Lendall

10  did not depose Aiello apparently because she could not track him down.  In any event, Aiello's

11  commission statements produced by Chase seem to indicate that he too received deductions

12  from his commission for underages (Gillespie Reply Decl. Exhs. at CMMC 1277).

13      Plaintiff resigned, or at least attempted to resign, in October 2003 (Compl. ¶ 22).

14  Shortly thereafter, Cossano "represented to Ms. Lendall that her actions in closing loans that did

15  not get into the system on time, where the rates were not locked in and where the lock-in was

16  not extended were fraudulent, a breach of contract and criminal" (*id*. ¶ 21).  Similarly, Lendall's

17  regional manager Ed Vaccaro allegedly "represented to Ms. Lendall that CMMC would bring

18  criminal charges against her which would result in her losing her home if she did not rescind her

19  resignation and return to her employment with CMMC" (*ibid*.).  Cossano testified during his

20  deposition that he indeed discussed with Lendall the possible criminal and civil ramifications of

21  her failure to repay Chase (Cossano Dep. 44).  After these discussions, Lendall sought legal

22  counsel to analyze her potential risk for civil and criminal liability arising from the underages

23  (Lendall Dep. 135).  Lendall, scared of losing her house and assets and even suffering criminal

24  penalties, chose to return to work at Chase.

25      In the months following July 2003, Chase and Lendall negotiated a manner for dealing

26  with the losses (Lendall Dep. 155, 193; Cossano Dep. 23).  In December 2003, Lendall and

27  Chase reached a purported agreement regarding Lendall's losses.  The December 2003

28  agreement primarily involved crediting Lendall with a higher commission rate than her ordinary

commission rate for her 2003 loans so as to help her offset the losses (*id*. at Exh. A; Lendall

Dep. 155; Cossano Dep. 23).  An email from Cossano explained the benefits of the agreement

to the other managers (Vaccaro Decl. Exh. A):

> Nancy [Lendall] has agreed to pay us the subtotal before the end of 2003.  I recommend accepting her proposal, because we will immediately collect $19,675 from Nancy.  If we do not accept, I predict that she will resign and will be forced to sue her for the balance.

Plaintiff testified that she only expressed "general agreement" with the proposal (Lendall

Dep. 155).  In any event, it seems that plaintiff was paid consistently with the December 2003

agreement, continuing to work as a loan officer to pay off the underages (Brebner Decl. Exh.

B).  Lendall apparently accrued no new underages (at least in the manner of delaying to lock in

requested rates) following her return to Chase in late 2003.  In June 2005, plaintiff ultimately

left her post as a loan officer, transferring to one of Chase's joint ventures.

*          *          *

On June 13, 2005, plaintiff filed her complaint in California Superior Court for the

County of Contra Costa.  Chase removed this action to federal court on August 12, 2005, on

grounds of diversity jurisdiction.  In her complaint, plaintiff listed two claims:  (1) breach of

oral contract and (2) fraud.  Plaintiff based her breach of contract claim on Chase's purported

failure to abide by the alleged oral promise (or promises) that Lendall could "negotiate rates

with underages without being charged for those underages in order to secure or maintain

CMMC's market share" (Compl. ¶ 16).  As to her fraud claim, plaintiff alleged that the

representations by Cossano and Vaccaro that Lendall's actions would subject her to civil and

criminal penalties were false misrepresentations.[*]

Chase moved for summary judgment on September 21, 2006.  Along with filing

opposition papers, plaintiff filed a motion for leave to amend her complaint.  By that motion to

amend, plaintiff seeks to add a claim under California Labor Code § 221.

---

[*] This Court issued an order on January 19, 2006, denying plaintiff's motion for a trial by jury.  The January 2006 held that plaintiff's undue delay in demanding a jury effected a waiver of that right.

**United States District Court**
For the Northern District of California

**ANALYSIS**

This order addresses both Chase's motion for summary judgment and plaintiff's motion for leave to amend.

1.    **MOTION FOR SUMMARY JUDGMENT.**

Summary judgment is proper where the pleadings, discovery and affidavits show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004). Once the moving party meets its initial burden, the nonmoving party must "designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thus *Celotex* creates a burden-shifting analysis for purposes of motions for summary judgment. "If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation omitted).

A.    **Fraud.**

As noted above, plaintiff claimed that Chase is liable for fraud as a result of her managers' threats to take civil and criminal action against her if she quit Chase without repaying the underages she owed to them. Accordingly, Lendall returned to work for Chase in late 2003, continuing to work with Chase for over a year, working to pay back the underages she had accrued in mid-2003.

In the Court's experience, threats of criminal prosecution in the civil context are so unusual and severe that, in the absence of a decision directly on point, this order must allow plaintiff to develop her fraud claim on a full record at trial. Neither party has provided a decision directly on point. Therefore, on this record, this order cannot find that defendant's threats of criminal prosecution are immune from liability for fraud as a matter of law.

8

**United States District Court**
For the Northern District of California

### B.     Breach of Oral Contract.

Chase has a stronger argument on plaintiff's claim for breach of oral contract.  On the current record, the facts seem strong in favor of Chase.  Nevertheless, since the same facts are likely to be evidence in background for plaintiff's fraud claim, this order denies summary judgment as to the contract claim as well.  In addition, the Ninth Circuit might not agree with Chase on the instant record that summary judgment is warranted.  While it is true that Lendall did not respond to defendant's motion for summary judgment with respect to her contract claim in her opposition papers, this failure was due to Lendall's belief that her motion to amend would be granted.  For the reasons stated below, her motion to amend is denied.  Plaintiff's counsel made clear during the oral argument that she could go forward with her contract claims as pled if the Court denied her motion to amend.

                        *                *                *

Counsel are reminded that the trial record will be a *new* record.  The ultimate findings of fact and conclusions of law will be made on the trial record, not on the instant summary-judgment record.  Any indication in this order as to which party has a stronger case has no necessary predictive value on the outcome at trial.

### 2.     MOTION TO AMEND.

Plaintiff's also moves for leave to amend so as to add a new claim for violation of California Labor Code § 221.  Leave to amend a complaint shall be freely given when justice so requires under Federal Rule of Civil Procedure 15(a).  This standard is a liberal one.  Rule 15(a), however, does not apply when a district court has established a deadline for amended pleadings under Rule 16(b).  *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992).  Once a scheduling order has been entered, the liberal policy favoring amendments no longer applies.  Subsequent amendments are not allowed without a request to first modify the scheduling order.  *Id*. at 608–09.  Any modification of the scheduling order must be based on a showing of good cause:

> Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment. . . .  Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the

9

> focus of the inquiry is upon the moving party's reasons for seeking modification.  If that party was not diligent, the inquiry should end.

*Id*. at 609 (citation omitted).  Seeking leave to amend while a motion for summary judgment is pending "is precisely the kind of case management that Rule 16 is designed to eliminate."  *Id*. at 610.

Under the case management order in effect in this case, "[l]eave to add any new parties or pleading amendments must be sought by February 16, 2006" (Case Management Order at 1).  The non-expert discovery cut-off, July 28, 2006, also already passed (*ibid*.).  The last day for dispositive motions was September 14, 2006 (*id*. at 3).

Plaintiff's delay of seven months beyond the deadline for amendments evidences a total lack of diligence.  California Labor Code § 221 provides that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."  It should have been clear to plaintiff at the outset of this action, prior even to *any* discovery, whether or not this code provision was implicated.  Plaintiff cannot articulate any "new" facts that suddenly alerted her to this possible claim over a year after she filed her complaint in state court.

Moreover, while prejudice to Chase is not dispositive, the prejudice to Chase is persuasive here.  Defendant fully proceeded with discovery in this action on the assumption that only two claims, breach and fraud, were in issue.  The discovery deadline has passed.  Suddenly, *after* Chase filed its motion for summary judgment, plaintiff sought to inject an entirely new legal theory into the action.  Had Chase known of this claim earlier in the litigation, Chase could have sought experts regarding Section 221, taken relevant depositions, and propounded affirmative discovery requests relating to this claim.  Adding this claim at the last minute would strip Chase of the opportunity to fully defend this claim.  This order will not countenance such dilatory tactics.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is **DENIED** and plaintiff's motion for leave to amend is also **DENIED**.  The hearing scheduled for plaintiff's motion to amend is hereby **VACATED**.  The discovery hearing, currently scheduled for

10

1    November 2, 2006, must be moved due to a conflict with the Court's schedule.  The hearing

2    will now be held on **NOVEMBER 6, 2006 AT 1:15 P.M.**

3

4        **IT IS SO ORDERED.**

5

Dated:  October 27, 2006                              

6                                          _____
                                           WILLIAM ALSUP
7                                          UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California